1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHRISTY MARIE CAMP,

              Petitioner,                    No. 1:06-cv-01906 ALA HC

    vs.

TINA HORNBEAK, Warden

              Respondent.             <u>ORDER</u>

_____/

      Pending before the Court are Christy Marie Camp's ("Petitioner") application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a) (doc. 1), Respondent's Motion to Dismiss (doc. 9), Petitioner's Response in Opposition to Motion to Dismiss (doc. 11), Respondent's Answer (doc. 16), and Petitioner's Reply, which she labeled "Traverse" (doc. 18).  Also before the Court is Petitioner's brief filed in response to this Court's December 19, 2007 order requesting additional briefing on the applicability of *Irons v. Carey*, 505 F.3d 846 (9th Cir. 2007) to this matter.  For the reasons discussed below, Petitioner's application is GRANTED.

**I**

**A**

      After a jury trial, the San Bernardino County Superior Court found Petitioner guilty on March 30, 1989 of second degree murder with the use of a weapon, in violation of California

1   Penal Code §§ 187, 12022(b).  She was sentenced to serve sixteen (16) years to life of

2   imprisonment.  On December 30, 2003, the BPT found Petitioner suitable for parole release and

3   set a release date.  The Governor reversed that decision pursuant to California Constitution

4   article V, section 8.

5                                                    **B**

6         The California Board of Prison Terms ("BPT") description of the crime at the hearing on

7   June 1, 2005, reads as follows:

8           Defendant Christy Camp lived with her husband Michael and their
            two children in Apple Valley.  On December 29, 1987, they
9           attended a party at a friend's home.  Five other adults were present
            and they spent the afternoon and evening drinking, watching
10          television, and talking.  Mrs. Camp testified that she had three
            beers and some codeine pills for an aching tooth.  Mr. Camp was
11          also drinking and had a blood alcohol level of .17 on autopsy.  At
            11 PM, the Camps, their children, and several other adults went to
12          the Camp's home.  When they arrived, they tried to start a fire in
            the fireplace and Mrs. Camp started to prepare some food.  Both
13          children started throwing up in the living room and Mr. and Mrs.
            Camp attended to them.  Mr. Camp then followed her into the
14          bedroom, grabbed her by the throat, and pushed her onto the bed.
            After making several critical remarks, he let her go.  They
15          continued arguing in the living room and one other woman left.
            Mrs. Camp asked her if she could go with her, but Mr. Camp
16          prevented his wife from leaving.  The two remaining men started
            arguing with Mr. Camp while his wife watched.  He then pushed
17          her onto the couch.  She stood up and he pushed her down again.
            She then got up and walked into the kitchen to get her knife.  She
18          returned to the living room with the knife in her left hand and her
            arms crossed.  According to Mrs. Camp, her husband then pushed
19          her down on the couch for a third time.  She then showed him the
            knife and said, you better stop doing that or something is going to
20          happen.  Mrs. Camp then testified that she got up, walked over to
            him, and stabbed him in the heart while he was standing up.  An
21          eyewitness testified, however, that Mrs. Camp tripped Mr. Camp,
            got . . . him down on the couch, sat on top of him, and stabbed him
22          while he was lying down.  Mr. Camp died shortly thereafter.
            Although Mrs. Camp admitted the stabbing, she presented a
23          defense of self-defense.  An expert witness with extensive
            experience in treating battered women was allowed to testify that
24          in her opinion, Mrs. Camp fit the pattern of a battered woman and
            that she had the Battered Woman's Syndrome.  The expert then
25          testified that this syndrome would have an impact on her thought
            processes.  The expert's testimony consumed over a day and a half
26          of trial time.

1   BPT 2005 Hearing Transcript 10-13.

2                                **C**

3       On June 1, 2005, the BPT determined that Petitioner was unsuitable for parole.

4   The BPT's 2005 decision reads as follows:

> [T]he Panel reviewed all the information received from the Public
> and relied on the following circumstances in concluding that
> you're not yet suitable for parole and would pose an unreasonable
> risk of danger to society or a threat to public safety if released
> from prison. . . . [T]his crime was the murder of Michael Camp,
> Mrs. Camp's husband.  There was a BWS investigation in this case
> and once again, I want to note that the findings of the investigation
> substantiate the inmate's claim that BWS was a factor at the time
> of the crime which contributed to the offense . . . .  Once again,
> this was a situation, based on the Statement of Facts, where this
> was an abusive relationship that Mrs. Camp was involved in with
> her husband where he was older than her.  There were witnesses
> that indicated that there was abuse, that she was in a situation that
> was basically out of her control as far as her own well-being.  And
> this was a crime that took place after an argument where Mr.
> Camp was physically and verbally abusive to her in front of other
> people.  And ultimately the end result of this argument and
> altercation this evening was that she took a knife out of her purse .
> . . and stabbed him once in the chest.  The knife blade went into his
> aorta and he was killed as a result of the attack.  We talked about
> her unstable social history, and I want to say that most of her
> unstable social history was not of her own making; it was as a
> result of the adults in her life.  She does have an unstable social
> history that is of her own making that is related to her running
> away from her foster home.  In asking her about it today,
> essentially what Ms. Camp told us was that she ran away primarily
> because her foster mother was strict.  I don't know that that was
> the only reason, because there were certainly other factors.  There
> was the fact that she'd been molested by her foster brother, but I
> asked her if she had reported it to anyone and she said that she had
> not.  So the running away from home was of her own making.
> That was her choice, and that does contribute to an unstable social
> history.  She's programmed well, but the Panel finds at this time,
> we believe that she's not yet sufficiently participated in beneficial
> self-help, and I'm going to go into some detail as to why we . . .
> believe that to be true.  She's had 24 128A counseling chronos.
> The last one was in 2000.  She's had five serious 115
> disciplinaries.  The last one was in 1997 for mutual combat.  Just
> prior to that, in '95, there was also 115 where she tested positive in
> a urine analysis for THC.  The psychological evaluation dated
> 3/28/05 and authored by Dr. Kunkel is very favorable, but there's
> some concern over the fact that it talks about her excellent
> behavior in prison and it really ignores some of the 115s that she

had, because it states that her infractions were minor and that they were 10 or more years ago.  And so there's certainly an implication that this doctor in coming to his conclusions was not considering the facts.  She does have good parole plans, especially for someone who doesn't have a family available.  She has a lot of letters of support . . . .  She has certainly been able to garner good community support and has made plans for what she would do should she be granted parole.  The hearing Panel notes that in response to 3042 notices, the District Attorney of San Bernardino County, as well as the San Bernardino County Sheriff's Department, both indicated opposition to a finding of suitability at this time. . . . We want to commend you for the work that you've done.  You've got your GED.  You've got an AA.  You've gotten basic paralegal and paralegal specialized practices.  You've been involved with Life Termer's.  You've done therapy, both as an individual and with the lifer's support group, and you also completed office services II, and there are other things.  These are just some of the things that you've done.  Currently, however, the positive aspects of behavior do not outweigh the factors of unsuitability . . . .  We feel that you need to continue self-help, and I'm going to tell you specifically why.  One of the greatest areas of concern for both of us was the fact that in talking about things like . . . why it's important to follow the rules, just because they're the rules, it was like you were justifying everything.  Well, yes, that was the rule and technically, I violated the OR, but.  And I think you spent a lot of time today with your lawyer hat on, and you spent a lot of time telling us what the laws were then and what the laws are now and why that kind of justifies what you did, as opposed to what was going on and why you did what you did.  And I really tried to get that out of you, and I just couldn't seem to get it out of you, and I don't know – The trouble for us is that that means that we don't know whether it's because you don't have the insight or just because you were in a conflicted role here today representing yourself.  So one of the things that I'm going to recommend is that you continue the self-help.  Continue to work on the insight.  Continue to look into why you presented today thinking that – When I asked you about rules, again, you know, what if you're on parole and parole officer has rules that you don't like, what are you going to do.  Well, your answer just didn't give us a lot of confidence that that part of you has changed . . . .  But also I want to really recommend to you that when you come back to your hearing next time that you have an attorney, because that way you're not having to fill both roles.  And so if we're asking you what were you thinking about at the time that you committed this crime, you're not going to be telling us about what second degree murder is.  You're going to tell us about you as an individual and what you were thinking at the time of the crime and what you think about it now.  *And it's those kinds of things that left us with questions, and that's really the primary reason for the denial*.  (emphasis added).

4

Petitioner filed a state petition for a writ of habeas corpus before the San Bernardino County Superior Court challenging the BPT's June 1, 2005 decision.  The San Bernardino County Superior Court denied her petition on November 28, 2005.

The San Bernardino County Superior Court's order reads as follows:

> The Petitioner has filed this Petition for Habeas Relief from the Board of Prison Hearings failure to release her on parole after 16 years of a 15 year-to-life sentence for second degree murder.
>
> Apparently the Petitioner was found suitable for parole at a hearing held on December 30, 2003.  The finding was reversed by the Governor pursuant to the provision of Penal Code § 3041.2(a). The Petitioner had a new suitable hearing on June 1, 2005, at which time she was found unsuitable.
>
> The Petitioner raises three contentions in support of her Petition. Her first contention is that her constitutional rights were violated when the Board found her suitable in 2003 and unsuitable in 2005. She is apparently taking a position that the Board was bound by its finding of suitability in 2003.  She is mistaken.  The governor reversed that finding and the Board in 2005 was free to reconsider suitability and make a different finding.
>
> Her second contention is that the governor violated her rights when he reversed the Boards decision of 2003.  The governor is given the power to reverse the decision as long as he considers the same factors used by the Board and considered in reaching its decision. Penal Code § 3041.2(a)(b).
>
> Her third basis for relief is a statement that the practice of the Board in referring to "custodial counseling" chronos showing disciplinary action against the Petitioner is illegal.  The use of this disciplinary material is in fact required to be considered by the Board as part of its factual review in reaching its decision.  *In re Rosenkrantz* 29 Cal 4th 616.
>
> The Petitioner has not stated a factual or legal basis to set aside the Board's finding of unsuitability in the 2005 hearing and the Petition for Writ of Habeas Corpus is denied.

Petitioner filed a petition for a writ of habeas corpus before the California Court of Appeal for the Fourth Appellate District.  That court summarily denied the petition on January 5, 2006.  Petitioner then filed a petition for review before the California Supreme Court.  That court denied the petition for review on November 15, 2006 citing *People v. Duvall* (1995) 9 Cal. 4th

464, 474 and *In re Robbins* (1998) 18 Cal. 4th 770, 780.  Petitioner filed an application for a writ of habeas corpus in this Court pursuant to 28 U.S.C. § 2254(a) on December 13, 2006.

II

Before this Court, Petitioner contends that she is entitled to habeas corpus relief.  She alleges that the BPT violated her federal constitutional rights under the Eighth and Fourteenth Amendments because the BPT did not base its decision on some evidence demonstrating that she was unsuitable for release on parole.

An application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a) "shall not be granted with respect to any claim that was adjudicated on the merits" in state court unless the adjudication of the claim:

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of  the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

As noted above, the California Court of Appeal and the California Supreme Court summarily denied Petitioner's state petition for habeas corpus relief.  The San Bernardino County Superior Court, however, issued a decision explaining its reasons for denying Petitioner's request for a writ of habeas corpus.  Pursuant to *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991), this Court must presume,  "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."  Accordingly, in applying § 2254(d), this Court must "look through" the unexplained decisions of the California Court of Appeal, and the California Supreme Court, to the decision of the San Bernardino County Superior Court to determine whether its decision was contrary to, or involved an unreasonable application of clearly

1   established federal law, as determined by the Supreme Court of the United States.  *Shackleford*

2   *v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

3                                                              **A**

4            Challenges to parole denials are construed as procedural due process claims.  "'A

5   procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally

6   protected liberty or property interest, and (2) a denial of adequate procedural protections.'"

7   *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002) (quoting *Brewster v. Bd. of Educ. of*

8   *Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998)).

9                                                              **B**

10           Citing Ninth Circuit authority, Petitioner contends that she is entitled to relief because a

11  California prisoner has a liberty interest in being released on parole protected by the Due Process

12  Clause of the Fourteenth Amendment.  In the Answer, Respondent maintains that no decision of

13  the United States Supreme Court has held that a state prisoner has a federally protected interest

14  in release on parole.  The Ninth Circuit has held that "California's parole scheme gives rise to a

15  cognizable liberty interest in release on parole."  *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d,

16  1123, 1127-28 (9th Cir. 2006).  This Court is bound by that conclusion.  *See Zuniga v. United*

17  *Can Co.*, 812 F.2d 443, 450 (9th Cir. 1987) (citation omitted) ("District courts are, of course,

18  bound by the law of their own circuit, and 'are not to resolve splits between circuits no matter

19  how egregiously in error they may feel their own circuit to be.'").

20                                                             **C**

21           In *Superintendent v. Hill*, 472 U.S. 445 (1985), the Supreme Court held that "revocation

22  of good time does not comport with 'the minimum requirements of procedural due process,'

23  unless the findings of the prison disciplinary board are supported by some evidence in the

24  record."  *Id.* at 454 (citation omitted).  The Ninth Circuit has held that *Hill*'s some evidence

25  standard applies to parole release proceedings.  *Sass*, 461 F.3d at 1128-29; *see Irons v. Carey*,

26  505 F.3d 846, 851 (9th Cir. 2007) ("the Supreme Court ha[s] clearly established that a parole

board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by 'some evidence in the record,' . . . or is 'otherwise arbitrary'").

"To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.'" *Sass*, 461 F.3d at 1128 (*quoting Hill,* 472 U.S. at 455-56).  "Hill's some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary.'" *Id.* at 1129 (*quoting Hill,* 472 U.S. at 457).

Respondent argues that because the Supreme Court has never applied the some evidence test to a parole decision, this Court is not required to follow *Irons*.  This Court must apply the Ninth Circuit's holding in *Sass* and *Irons* that the some evidence standard applies in parole release decisions.  *Zuniga*, 812 F.2d at 450.  Therefore, the question before this Court is whether there is some evidence to support the BPT's decision that Petitioner would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.

**III**

**A**

Petitioner contends her federal due process rights were violated, and that she is entitled to be released on parole, because there is no evidence to support the BPT's 2005 decision that she was "not yet suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison."  BPT 2005 Decision 1.  Pursuant to *Irons*, "we must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by 'some evidence' . . . constituted an unreasonable application of the 'some evidence' principle articulated in *Hill*, 472 U.S. at 454." *Irons*, 505 F.3d at 851.  In *Woodford v. Visciotti*, 537 U.S. 19 (2002), the Supreme Court stated

that § 2254(d) requires a federal court to apply a "highly deferential standard for evaluating state-court rulings." *Id.* at 24 (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)). "Resolution of any conflicts in the evidence and the weight to be given the evidence are within the authority of the Board." *In re Rosenkrantz*, 29 Cal. 4th 616, 656 (2002). "[T]he importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." Cal. Code Regs., tit. 15 § 2402(c).

Pursuant to section 3041(a) of the California Penal Code the BPT must normally set a parole release date "[o]ne year prior to the inmate's minimum eligible parole release date." The setting of a parole date is not required if the BPT determines that

> the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

Cal. Pen. Code, § 3041(b).

Title 15, section 2402, subdivision (b) of the California Code of Regulations, reads as follows:

> All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

Title 15, section 2402, subdivision (c) of the California Code of Regulations, sets forth

the circumstances tending to indicate unsuitability.[1]  The BPT must consider each of the six

factors in section 2402(c) to determine whether there is some evidence to support a finding of

unsuitability.  *Irons*, 505 F.3d at 851.  For the reasons set forth below, the Court concludes that

the BPT failed to indicate the evidence it relied upon to support its finding that Petitioner would

pose an unreasonable risk of danger to society if released from prison.

**1**

Pursuant to section 2402(c)(1), the BPT was required to determine whether "the prisoner

committed the offense in an especially heinous, atrocious or cruel manner."  A prisoner's

commitment offense, on its own, may justify parole denial if "the Board can 'point to factors

beyond the minimum elements of the crime for which the inmate was committed' that

demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if

---

[1]  Cal. Code Regs., tit. 15 § 2402(c) reads as follows:

(1) Commitment Offense.  The prisoner committed the offense in
an especially heinous, atrocious or cruel manner.  The factors to be
considered include:
(A) Multiple victims were attacked, injured or killed in the same or
separate incidents.
(B) The offense was carried out in a dispassionate and calculated
manner, such as an execution-style murder.
(C) The victim was abused, defiled or mutilated during or after the
offense.
(D) The offense was carried out in a manner which demonstrates
an exceptionally callous disregard for human suffering.
(E) The motive for the crime is inexplicable or very trivial in
relation to the offense.
(2) Previous Record of Violence.  The prisoner on previous
occasions inflicted or attempted to inflict serious injury on a
victim, particularly if the prisoner demonstrated serious assaultive
behavior at an early age.
(3) Unstable Social History.  The prisoner has a history of unstable
or tumultuous relationships with others.
(4) Sadistic Sexual Offenses.  The prisoner has previously sexually
assaulted another in a manner calculated to inflict unusual pain or
fear upon the victim.
(5) Psychological Factors.  The prisoner has a lengthy history of
severe mental problems related to the offense.
(6) Institutional Behavior.  The prisoner has engaged in serious
misconduct in prison or jail.

released." *Irons*, 505 F.3d at 852 (quoting *Dannenberg*, 34 Cal. 4th 1061,1071 (2005)).  In California, "[s]econd degree murder is defined as the unlawful killing of a human being with malice aforethought, but without the additional elements-i.e., willfulness, premeditation, and deliberation-that would support a conviction of first degree murder."  *People v. Nieto Benitez*, 4 Cal. 4th 91, 102 (1992).  The evidence of Battered Woman Syndrome ("BWS") "was a factor at the time of the crime which contributed to the offense."  BPT 2005 Decision 1.  The record does not demonstrate that Petitioner committed any act beyond the minimum elements of second degree murder.  She intentionally stabbed her husband in the heat of passion brought about by his physical abuse in the presence of her friends.

None of the factors that would make this an "especially heinous, atrocious or cruel" offense are present under section 2402(c).  Multiple victims were not attacked, injured or killed.  The offense was not carried out in a dispassionate or calculated manner.  Petitioner acted on impulse because she feared for her life.  The victim was not abused, defiled or mutilated during or after the offense.  The offense was not carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.  The motive for the crime was not inexplicable or trivial in relation to the offense.  She had been assaulted by her husband for years and feared for her life or safety.

**2**

Pursuant to section 2402(c)(2), the BPT was required to determine whether there is a previous record of violence.  The BPT did not rely on this factor.  The record does not show that Petitioner has a previous record of violence.

**3**

Pursuant to section 2402(c)(3), the BPT was required to determine whether Petitioner had an unstable social history.  In its decision, the BPT relied on the fact that she ran away from her foster mother when she was twelve years old as evidence of an unstable social history.  The record shows that before running away, Petitioner was sexually molested by her foster brother.

1   It also shows that after she ran away, she had sex with men in exchange for places to stay.  These

2   facts that occurred when she was a twelve year old adolescent, do not support a finding that she

3   presently poses an unreasonable risk of danger to society.

4                                              **4**

5          Pursuant to section 2402(c)(4), the BPT was required to determine whether there is

6   evidence of sadistic sexual offenses.  The BPT did not rely on this factor in finding Petitioner

7   unsuitable for parole release.  There is no evidence in the record that Petitioner has ever

8   committed a sadistic sexual offense.

9                                              **5**

10         Pursuant to section 2402(c)(5), the BPT was required to determine whether "[t]he

11  prisoner has a lengthy history of severe mental problems related to the offense." *Id.*  There is no

12  evidence in the record that Petitioner has ever suffered from any mental problems.

13                                             **6**

14         Pursuant to section 2402(c)(6), the BPT was required to determine whether "[t]he

15  prisoner has engaged in serious misconduct in prison or jail." *Id.*  The BPT noted that Petitioner

16  has a record of five (5) serious rules violations.  The last, for mutual combat, occurred in 1997.

17  During the hearing, Petitioner was asked, "[Y]ou're going to run into people who might be

18  violent or who just might be idiots.  How do you control your response to them and not be

19  violent?"  Petitioner responded:

20              It's just not a choice anymore to be violent.  I mean, there aren't
                weapons involved.  I would certainly be very conscientious of
21              anything that could be used as a weapon.  There's options of
                walking away, which weren't available in my marriage, nor are
22              they available here sometimes.  And yes, I could have walked
                away from that fight in '97.  Again, I'm not trying to mitigate the
23              situation that occurred.  I could have very well walked away from
                that situation and I chose not to, but I believe now that over – I
24              have had people assault me and not responded back to them, okay,
                since '97, so I have been tested and I know for a fact that my
25              response was not violence or else I would either have engaged in a
                fight that wasn't discovered or I would have another 115.  So I've
26              been assaulted since this period and not responded with violence

                                              12

1    and I've walked away from the situation.

2    BPT 2005 Hearing Transcript 67-68.  The BPT did not indicate how her prior institutional

3    behavior would make her an unreasonable risk of danger to society today.

4                                                     **B**

5          The BPT stated that the "primary reason for the denial" of a parole release date was

6    Petitioner's failure to discuss her state of mind when she stabbed her husband.  The BPT stated:

7                     And so if we're asking you what were you thinking about at the
                     time that you committed this crime, you're not going to be telling
8                     us about what second degree murder is.  You're going to tell us
                     about you as an individual and what you were thinking at the time
9                     of the crime and what you think about it now.

10   BPT 2005 Decision 6.

11         As discussed above, we must look to California law to determine whether the findings of

12   the BPT were supported by "some evidence."  *Irons*, 505 F.3d at 851.  The California Court of

13   Appeal held in *In re Caswell*, 92 Cal. App. 4th 1017, 1033 (2001), that "a prisoner's refusal to

14   admit participation in the crime on matters of conflicting evidence does not necessarily

15   constitute unsuitability for parole or mandate rescission."  The Court in *Caswell* relied on title

16   15, section 2236 of the California Code of Regulations for this proposition.  Section 2236 reads

17   as follows:

18                    The facts of the crime shall be discussed with the prisoner to *assist
                     in* determining the extent of personal culpability. The board shall
19                    not require an admission of guilt to any crime for which the
                     prisoner was committed. A prisoner may refuse to discuss the facts
20                    of the *crime in which instance a decision shall be made based on
                     the other information available* and the refusal shall not be held
21                    against the prisoner. (emphasis added).

22   The Court noted in *Caswell* that the prisoner "acknowledged responsibility and demonstrated

23   remorse."  *Caswell*, 92 Cal. App. 4th at 1033.  The prisoner in *Caswell* testified that "the crimes

24   escalated because of his 'inability to control' and his 'omission to do anything to counter what

25   [Englund] want[ed] [him] to do.'"  *Id.*

26         The BPT asked "what [Petitioner] was thinking at the time of the crime and what [she]

think[s] about it now." BPT 2005 Decision 6.  She responded

> I believe it was fear, but also – I've not said this before – I believe
> now that there also could have been some anger involved as well.
> Anger is a secondary emotion, so you have to have a primary
> emotion before you can have the secondary, and I believe there
> was some anger or some hurt there, which would constitute anger
> at that time, yes.

BPT 2005 Hearing Transcript 14.  The record does not demonstrate that Petitioner refused to discuss her conduct or motivation that caused the death of her husband.  There is no evidence that Petitioner did not comment truthfully on her "past and present attitude towards the crime."  15 Cal. Code Regs., tit. 15 § 2402(b).   Pursuant to title 15, section 2236 of the California Code of Regulations, the BPT's attempt to elicit further facts of the crime was impermissible.  Thus, under California law, the BPT cannot rely on the Petitioner's comments about the crime as its "primary reason" for finding her unsuitable for parole.

## C

Petitioner also contends that she is entitled to habeas corpus relief because there was no new evidence of her dangerousness between the 2003 and 2005 BPT decisions.  Petitioner cites *McQuillion v. Duncan*, 306 F.3d 895 (9th Cir. 2003), for the proposition that there must be new evidence in order to revoke a past grant of parole.  In *McQuillion*, "the California Board of Prison Terms, in 1994, rescinded as 'improvidently granted' his parole date, which had been set in 1979."  306 F.3d at 898.  The Court held that his parole rescission violated due process because "the Board's grounds for its later rescission reflect nothing more than a disagreement with the ultimate determination reached by the earlier granting panel . . . ." *Id.*

At the 2003 BPT Hearing, Petitioner was found suitable for parole and a release date was determined.  The Governor reversed the BPT's 2003 decision.  *McQuillion* does not apply in this instance.  The BPT did not revoke its 2003 grant of parole.  The Governor did so pursuant to California Constitution article V, section 8.  The Governor's decision is controlling.  Cal. Const.

1  art. V, § 8.  Petitioner does not challenge the Governor's decision.[2]

2  **Conclusion**

3      In its 2005 decision, the BPT failed to indicate facts that would constitute some evidence

4  that Petitioner would now pose an unreasonable risk of danger to society.  To the contrary, the

5  BPT found commendable Petitioner's vocational work and participation in self-help programing.

6  The record shows that she has no past criminal record.  She was a victim of BWS when she

7  killed her husband.  She has used her time in prison to develop marketable skills and has plans

8  for her release.  The BPT noted that "[s]he does have good parole plans, especially for someone

9  who doesn't have a family available.  She has a lot of letters of support . . . .  She has certainly

10  been able to garner good community support and has made plans for what she would do should

11  she be granted parole."  BPT 2005 Decision 3.  Pursuant to *Sass* and *Irons*, the BPT's refusal to

12  set a parole date violated her federally protected liberty interest.  *Sass*, 461 F.3d at 1127; *Irons*,

13  505 F.3d at 851.

14      In its decision denying Petitioner's request for habeas corpus relief, the San Bernardino

15  Superior Court failed to apply the some evidence standard in determining whether the BPT had

16  articulated any facts to support its finding that Petitioner was unsuitable for release on parole.

17      It is therefore hereby ORDERED that Petitioner's application for habeas corpus relief is

18  GRANTED because of the absence of some evidence that Petitioner would pose a danger to

19  society if she were released on parole.  The BPT is ordered to vacate the denial of a parole

20  release date and to conduct a new parole suitability hearing.  The BPT cannot deny Petitioner a

21  parole release date unless it demonstrates that there is some evidence that she poses an

22  unreasonable risk of danger to society today.  The hearing shall be held no later than 45 days

23  /////

24  /////

25

26      [2]On August 29, 2007, this Court dismissed Petitioner's claims regarding the Governor's 2003 decision as time barred (doc. 13).

1  from the date of this Order.  *In re Roderick*, 154 Cal.App.4th 242, 278 (2007).  The clerk is

2  directed to enter judgment and close the case.

3  /////

4  DATED: July 18, 2008

5                                          /s/ Arthur L. Alarcón

6                                          _____
                                           UNITED STATES CIRCUIT JUDGE
                                           Sitting by Designation

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26